# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

James V. Roth,                                              Civil No. 12-452 (DWF/SER)

                    Plaintiff,

v.                                                          **MEMORANDUM**
                                                           **OPINION AND ORDER**

The Northwestern Mutual
Life Insurance Company,

                    Defendant.

_____

Alesia R. Strand, Esq., and Thomas J. Beedem, III, Esq., Beedem Law Office, counsel for Plaintiff.

Benjamin C. Johnson, Esq. and Erik T. Salveson, Esq., Nilan Johnson Lewis PA, counsel for Defendant.

_____

## INTRODUCTION

This matter is before the Court on a motion for summary judgment brought by

Defendant The Northwestern Mutual Life Insurance Company ("Defendant").  (Doc.

No. 15.)  For the reasons set forth below, Defendant's motion is granted.

## BACKGROUND

Plaintiff James Roth ("Roth") maintained five separate disability insurance

policies through Defendant until those policies lapsed in January and April 2003.  (Doc.

No. 19 ("Schwallie Aff.") ¶ 35, Ex. 32.)  In August 2009, Roth applied for benefits under

the policies' waiver of premium provisions, claiming that he became totally disabled by

January 1, 2003, because he was suffering from bipolar disorder. (*Id.* ¶ 29, Ex. 26.)

Defendant denied his claim, and Roth brought this lawsuit. (*Id.* ¶ 31, Ex. 28.)

Roth is an attorney who began his legal career at Leonard, Street and Deinard, P.A. (Doc. No. 20 ("Salveson Aff.") ¶ 2, Ex. 33 ("Roth Dep. Vol. I.") at 16-17.) In 1997, Roth was hired as a partner by Messerli & Kramer, P.A. (*Id.* at 22-23.) Roth continues to hold a license to practice law in the state of Minnesota, although he was placed on inactive status in 2011.

In December 2001, Roth visited his physician complaining of depression. (Schwallie Aff. ¶ 9, Ex. 6 at 6.4.) The physician prescribed an antidepressant. (*Id.*) Roth had two more appointments with his physician in late 2002 and early 2003, but the treatment notes from those appointments do not mention any mental health concern. (*Id.* at 6.5-6.6.) Not until June 2003 did Roth again see his physician because of depression, and at that time the physician again prescribed an antidepressant with no psychiatric follow-up. (*Id.* at 6.6.)

Roth left the law firm in the spring of 2003, ostensibly to pursue other business opportunities, although he maintained his law practice in an "of counsel," part-time capacity. (*Id.* ¶ 11, Ex. 8.) He now claims that his departure was because of his bipolar disorder; he was in a manic phase and had grandiose plans to build a business developing a line of women's clothing. By mid-July 2003, however, the manic phase had ended and Roth was admitted to a psychiatric hospital for two weeks of inpatient treatment. (*Id.* ¶ 9, Ex. 6 at 6.9.)

Roth returned to work after his release from treatment, and his physician noted

that he was preparing for a trial in November 2003.  (Salveson Aff. ¶ 3, Ex. 34 ("Roth

Dep. Vol. II") at 179-80 (Roth was working six hours per day in September 2003 to

prepare for an arbitration proceeding); Schwallie Aff. ¶ 9, Ex. 6 at 6.27 (Oct. 14, 2003,

doctor's note).)  The few medical records for this period indicate that Roth was

functioning well.  Indeed, he told his physician in February and April 2004 that he was

working full-time.  (Roth Dep. Vol. II at 187-90; Schwallie Aff. ¶ 9, Ex. 6 at 6.30.)

Roth ended his employment with Messerli & Kramer in February 2004.  (Doc.

No. 25 ("Roth Aff.") ¶ 10.)  Roth claims that he was hospitalized three additional times

between 2005 and 2008.[1]  (*Id.* ¶¶ 15, 16, 22.)  But in 2007, Roth was able to return to the

legal profession as what he characterizes as a "law clerk," although he sought

reinstatement of his law license at that time so that he could represent clients in court

proceedings.[2]  (Roth Dep. Vol. I at 72-73.)  Roth also sought disability benefits from the

Social Security Administration in 2006 and ultimately received benefits of more than

$2,000 per month.  (Schwallie Aff. ¶ 24, Ex. 21.)  In September 2009, however, his

physician noted that Roth "CAN work," albeit not as a trial attorney.  (Roth Dep. Vol. II

at 202-03.)

---

[1]      These hospitalizations are not reflected in the medical records provided to the
Court.

[2]      Roth's law license has been on inactive/disabled status since 2011.  Minnesota
Supreme Court Lawyer Registration Database,
http://www.mncourts.gov/mars/AttorneyDetail. aspx?attyID=0093774, last visited
Mar. 13, 2014.

There is no dispute that Roth stopped paying the premiums on his five disability insurance policies in late 2002 or early 2003 and that they all lapsed.[3]  The earliest lapse occurred on January 14, 2003, and the latest lapse occurred on April 23, 2003. (Schwallie Aff. ¶ 35, Ex. 32.)  Roth claims that these policies should be reinstated under the waiver-of-premium provisions each policy contains.  (*See, e.g.*, Schwallie Aff. ¶ 2, Ex. 1 ("Policy No. D1218485") § 2.9.)  Further, Roth argues that his claim for benefits under the policies is timely because it was made within a "reasonable time" after the onset of his mental illness.  In other words, Roth contends that:  (1) his mental illness means he is not responsible for paying the premiums on his insurance policies; and (2) his mental illness excuses his nearly seven-year delay in seeking benefits under those policies.

## DISCUSSION

### I.    Legal Standard

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The Court must view the evidence and the inferences that may be reasonably drawn from the

---

[3]    Roth maintained life insurance policies with Defendant and these, too, lapsed in the spring of 2003.  (*See, e.g.*, Strand Aff. ¶ 18, Ex. P at 10-11.)  Roth sought to reinstate the life insurance policies in October 2003.  (Salveson Aff. Ex. 35 ("Roth Dep. Vol. III") at 263-64.)  Defendant granted Roth a waiver of premiums for these policies and found that, under these policies, he had established total disability as of August 1, 2003. (Strand Aff. ¶ 18, Ex. P at 10-11 & Dep. Ex. 11.)  Defendant argues that the waiver-of-premium provisions in the life insurance policies are materially different from those in the disability insurance policies, but has not submitted the life insurance policies' waiver provisions to the Court.

evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.   Motion for Summary Judgment

Defendant argues that summary judgment is appropriate for three reasons. First, all of the policies under which Roth is claiming benefits lapsed before he became disabled. Second, Roth's claim submission was untimely and is therefore barred. Finally, even if his claim is not barred, Roth has failed to establish that he was totally disabled.

A.    **Waiver of Premiums**

There is no dispute that Roth failed to pay the premiums due on his disability

insurance policies in 2003 and that all of the policies therefore lapsed.  Roth contends that

all of his policies should be reinstated because of the waiver-of-premium benefit the

policies contained.  (Schwallie Aff. ¶¶ 4-8, Ex. 1 § 2.9, Ex. 2 § 1.9, Ex. 3 § 1.7, Ex. 4

§ 1.7, and Ex. 5 § 1.7.)  Each policy's language is slightly different, but each provides

that Defendant will waive the payment of premiums during a period of total or partial

disability that arises during the pendency of the policy.  (*Id.*)  However, the waiver of

premiums is not open-ended.  Rather, "[w]hen the disability ends, [Northwestern Mutual]

will no longer waive the payment of premiums."  (*E.g.*, *id.* ¶ 8, Ex. 5 § 1.7.)

Roth claims that he was disabled[4] as of January 1, 2003, thus excusing his failure

to pay the premiums that were due in January and April 2003.  Taking the evidence in the

light most favorable to Roth, Roth has established that there are genuine issues of fact as

to whether he was totally or partially disabled as of January 1, 2003, and thus whether his

failure to pay premiums at that time should be excused.

This conclusion does not end the Court's inquiry, however.  The evidence, taken

in the light most favorable to Roth, establishes beyond a doubt that his disability ended,

at least for a significant period of time, in September 2003.  His doctors reported that

---

[4]      As discussed in more detail below, Roth's testimony as to whether he was totally
or partially disabled as of January 1, 2003, is inconsistent.  For purposes of the
waiver-of-premium benefit, however, it is of no moment whether he was only partially
disabled as of January 2003, because Defendant waives the premium for either level of
disability.

Roth was working either full-time or nearly full-time from September 2003 through at least April 2004.  (Roth Dep. Vol. II at 181-90; Schwallie Aff. ¶ 9, Ex. 6 at 6.30.)  When the disability ended, Roth again became liable for premiums on his disability policies.  Thus, those policies lapsed, at the latest, in the fall of 2003.

Moreover, it is clear that if Roth's disability persisted through 2003 and 2004, it had again ended at least temporarily by 2007, when he began working as a lawyer representing clients in disability proceedings.  Roth claims that he was totally disabled throughout the entire period from 2003 to the present, but his work history belies that claim.  Roth was not entitled to a waiver of his premiums for the entire period from 2003 to 2009 (when he made a claim), and his policies lapsed.  Roth is therefore not entitled to benefits under those policies.

### B.        Timeliness of Claim

Even if his policies did not lapse, Roth's disability claim was untimely.  Four of the policies require Roth to provide written notice of his claim of disability within 60 days after the start of the disability, or "as soon as reasonably possible."  (Schwallie Aff. ¶¶ 5-8, Ex. 2 § 4.1, Ex. 3 § 4.1, Ex. 4 § 3.1, and Ex. 5 § 4.1.)  One policy contains a more restrictive notice period, requiring proof of disability "no later than one year and 90 days after the end of each monthly period for which benefits are claimed, unless the [insured] was legally incapacitated."  (*Id.* ¶ 4, Ex. 1 at § 5.1.)  Roth does not claim that he was legally incapacitated at any time from 2003 to the present.  Thus, even if he provided timely notice under this particular policy, he is entitled only to benefits under that policy for one year and 90 days before his August 2009 notice.

There is no dispute that Roth did not notify Defendant of his claimed disability until more than six years after that disability allegedly arose.  Although there is no definition of what constitutes "as soon as reasonably possible" in insurance law, there can be no doubt that a delay of more than six years is not "as soon as reasonably possible." *See, e.g.*, *Dawson v. Nw. Mut. Life Ins. Co.*, Civ. No. 10-2641, 2011 WL 4842543, at *2 (D. Minn. Oct. 12, 2011) (finding seven-year delay in notice under disability policy untimely).

Roth's only reason for his failure to provide notice is his contention that he did not remember that he had disability insurance policies with waiver-of-premium clauses until sometime in 2007 or 2008.  As in *Dawson*, he contends that the Court should not strictly enforce the policies' notice provisions because Defendant was not prejudiced by his delayed notice.  *Id.* at *3.  It is true that, in some cases, "mere failure to give timely notice [is not] fatal to an insured's claim . . . as long as the insurer was not prejudiced by the delay."  *Ryan v. ITT Life Ins. Corp.*, 450 N.W.2d 126, 130 (Minn. 1990).  However, an "extraordinary length of time between an event and notification [can] be prejudicial in itself."  *Reliance Ins. Co. v. St. Paul Ins. Cos.*, 239 N.W.2d 922, 925 (Minn. 1976).

Here, viewing the evidence in the light most favorable to Roth, it is clear that Defendant was prejudiced by the extraordinary delay between the onset of Roth's bipolar disorder and the time he first claimed disability benefits.  Defendant was unable to undertake any contemporaneous investigation to determine the extent of Roth's disability, something that even Roth himself inconsistently describes.  Roth also provided Defendant with affidavits from co-workers and relatives describing his disability, but

those affidavits were executed more than seven years after the fact, rendering their value suspect.

Although each case must be evaluated on its own merits, a delay of six and one-half years between the alleged onset of disability and notice to the insurer constitutes prejudice to the insurer in this case. Roth's notice was untimely and his claim for disability benefits fails.

### C.      Disability

Finally, Defendant contends that Roth is not entitled to benefits because he has failed to establish that he was totally disabled from 2003 to the present. For the first time in his opposition to the present motion for summary judgment, Roth contends that he is seeking benefits for either total disability or partial disability. But in his deposition, he described his claim as one for total disability from January 1, 2003, onward; he cannot, at this late stage of the proceedings, change course and expect Defendant to evaluate his claim as one for partial disability benefits.[5]

The record shows that Roth was not totally disabled at all times from 2003 to the present. As noted, he continued to work, at least part-time, in 2003 and 2004, and from 2007 to 2009. This employment alone precludes his claim of total disability, because under his insurance policies, total disability requires that the insured not be "gainfully employed in any occupation." (*See, e.g.*, Schwallie Aff. ¶ 4, Ex. 1 § 1.4 (definition of

---

[5]      Even if Roth had a valid claim for partial disability benefits, that claim would fail because, as explained above, his policies had lapsed and his claim was untimely.

total disability).)  Moreover, "[i]f the Insured can perform one or more of the principal duties of the regular occupation, the Insured is not totally disabled."  (*Id.*)  It is undisputed that for long periods of time, including when he worked as a law clerk, Roth was performing at least one, if not more, of the principal duties of a lawyer.  He cannot claim total disability for the period 2003 to the present.

## ORDER

Based on the foregoing, and the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Defendant's Motion for Summary Judgment (Doc. No. [15]) is **GRANTED**.

2.     Defendant is entitled to judgment on Plaintiff's claims.

3.     Plaintiff's Amended Complaint (Doc. No. [2]) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  March 28, 2014                     s/Donovan W. Frank
                                           DONOVAN W. FRANK
                                           United States District Judge